## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JASON PARMELEY | ) | |
| MARCO GUIRLANDO | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.   20-370-JPG |
| v. | ) | |
| | ) | Complaint |
| DONALD J. TRUMP | ) | |
| WILLIAM BARR | ) | |
| M.D. CARVAJAL | ) | |
| ADAM W. COHEN | ) | |
| TOM WERLICH | ) | |
| | ) | |
| Defendants, | ) | |

## COMPLAINT

Plaintiffs JASON PARMELEY and MARCO GUIRLANDO, filing as a Pro-Se litigates

individually and on behalf of a class of similarly situated individuals, file this complaint for

declaratory and injunctive relief against the Defendants UNITIED STATES ATTORNEY,

William Barr, DIRECTOR of THE FEDERAL BUREAU OF PRISONS, M.D. Carvajal,

DIRECTOR of DEPARTMENT OF JUSTICE, Adam W. Cohen, and  WARDEN TOM

WERLICH and others and alleged as follows:

### INTRODUCTION

1. Without urgent action by Federal Bureau of Prisons director and the Department of
   Justice Director to drastically reduce Federal prison populations, the Novel Corona Virus
   (COVID-19) is likely to spread not just inside the prison system, but throughout the
   general public in the communities where the Federal prisons are located.  Nearly 176,000
   Federal inmates are housed by the Federal Bureau of Prisons, living in close quarters
   where all aspects of daily life, including healthcare, and recreation take place.  As with
   other congregate settings like nursing homes and long term disability facilities, even with
   social distancing can never be fully or effectively implemented in a correctional
   institution.  Each day thousands of staff must come and go from a correctional facility

1

and potentially carry with them the Novel Corona virus for day's even weeks without ever showing symptoms.  These settings pose a particular risk of spreading the virus, with catastrophic consequences not just to the prisoners and staff, but also to their communities and the hospitals that serve them.

2. To underline the devastating impact COVID-19 will and is having to the FBOP and the communities that house those prisons, one need look no further than Patrick Jones.  On March 20, 2020 the FBOP announced the first confirmed case of COVID-19 at the Federal Correctional Institution at OAKDALE I, Louisiana.  Just eight days later the FBOP announced that Patrick Jones, a Federal inmate had passed away from Covid -19.  On March 28, 2020 the FBOP announced that more than **226 inmates and 131 staff members** have been hospitalized with confirmed cases of COVID-19.  This is without the testing of inmates.  It is said that 20% of the prison population of the FBOP could be infected, however this number will not be confirmed without wide spread action from the FBOP director to implement testing of all prisoners and staff.

3. FBOP reality might be avoided if the FBOP, and the UNITED STATES ATTORNEY and the PRESIDENT OF TH UNITED STATES acts with the urgency and scope required to mitigate the oncoming harm.  Instead the FBOP has continued to house prisoners who do not need to be housed, thousands of elderly, disabled, medically vulnerable, non-violent offenders and those with viable clemency in front of the PRESIDENT OF THE UNITED STATES should all be looked at for immediate release, those inmates who have a pathway home should be released.  These prisoners could be released, many of whom are approaching their release dates and have homes in which they could more safely quarantine.  To effectively prevent spread of the COVID-19 infection in prison communities, the Defendants must take urgent steps to discharge, compassionate release, or transfer to home detention all prisoners that could be released and does not pose a risk to the general public, particularly those who are elderly and medically vulnerable.

4. Every single prisoner in the FBOP custody faces a substantially increased risk of harm as a result of the Defendants failure to take reasonable measures to stop the spread of COVID-19 by refusing to take great steps to substantially reduce prisoners living in BOP by implementation of compassionate release, transfer to electronic monitoring/home detention, and clemency that have been waiting and could be signed off on at any time.  Even people who lack an available pathway to release are harmed because their likelihood of contracting the virus is substantially increased and their ability to access preventative sanitation resources and medical care is adversely affected.

5. If they, Defendants, took these steps, either by court order or on their own accord the FBOP would be reduced by almost half.  This half of FBOP population coincides with

2

the amount of medical resource, custody staff it has on hand at the present time to effectively manage that reduced number of prisoners. Before this Novel COVID-19, medical department would make prisoners wait six months for appointments with a specialist. By reducing these numbers, prisoners would be able to be housed in single cells in all prisons situated in that type of housing, as well they would also be able to practice social distancing. These measures would prevent the spread of the virus and allow prisoners to be housed alone and be in control of the exposure. Whereas not, if one prisoner maintains a strict social-distancing because of his compromised health situation but then his cellmate goes out and mingles with others, there is no doubt that then the cellmate would pass it to the others.

6.  Class members who are elderly and medically vulnerable, and those with PATHWAYS to release, must be released IMMEDIATELY. ACTION is needed RIGHT THIS MOMENT TO STOP THE SPREAD of COVID-19 inside the Federal BOP. This is to protect the individuals who live and work in the prisons who are not informed, not protected correctly and vulnerable if the FBOP fails to act. As well as the broader communities from the serious risk of harm to their health and safety. The Government is not acting with sufficient measures urgently, and without intervention from the Court, people are going to die unnecessarily.

## [JURISDICTION AND VENUE]

7.  This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 1343(a). This Court has authority to GRANT declaratory relief under 28 U.S.C. SEC 2201 and 2202.

8.  Venue is proper in this district under 28 U.S.C. SEC 1391 because the parties— DEFENDANTS giving rise to the claims asserted in this complaint occurred in this judicial district. Decisions and those who maintain FBOP policy including clemency take place in this judicial district.

## [PARTIES]
### (ARE SUED IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)

9.  Plaintiff, JASON PARMELEY, is and has been at all times relevant, a Federal Bureau of Prison prisoner.

10. Plaintiff, MARCO GUIRLANDO, is and has been at all times relevant, a Federal Bureau of Prison *pre-trial detainee*.

11. Defendants, Donald J. Trump, President of the UNITED STATES.

12. Defendant, William Barr, UNITED STATES ATTORNEY GENERAL.

13. Defendant, Michael Carvajal, Director of the Federal Bureau of Prisons.

14. Defendant, Adam W. Cohen, Director of the Department of Justice.

15. Defendant, Tom Werlich, Warden at FCI Greenville

## FACTUAL ALLEGATIONS

**I.    The COVID-19 outbreak has created a National and Global HEALTH EMERGENCY**

16. We are living in the midst of an extreme, unprecedented worldwide health emergency caused by rapid spread of the Coronavirus, COVID-19.  The World Health Organization (WHO) has declared COVID-19 to be a Global Pandemic. **(1)**  On March 13, 2020, President Trump declared a National Emergency. **(2)**

17. The number of known COVID-19 infections is increasing daily.  As of **April 15, 2020**, there were **more than 2,023,623** reported COVID-19 cases throughout the world and **more than 128,890** people have died as a result of the virus. **(3)**  In the UNITED STATES alone, there are **over 614,643 confirmed cases** and **over 26,112 deaths. (4)** The number of COVID-19 cases in the UNITED STATES is expected to grow exponentially, as well as the confirmed cases in the FBOP.  The Center for Disease Control and Prevention (CDC) projects that without swift and effective public health interventions over 200 million people in the U.S. could be infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths. **(5)**

18. COVID-19 is a particularly contagious disease.  A recent study showed that the virus can survive up to three hours in the air, four hours on copper, up to twenty-four hours on cardboard, and up to two days on plastic and stainless. **(6)**  Indeed, a new study of an early cluster of COVID-19 cases in Wuhan, China revealed the dangers of indirect transmission resulting from infected people contaminating common surfaces—in the study, it was commonwealth mall bathrooms. **(7)**

19. Controlling the spread of COVID-19 is made even more difficult because of the prominence of asymptomatic transmission—people who are contagious but who exhibit no symptoms, rendering ineffective any screening tools dependent on identifying disease symptoms. **(8)**

4

20. There is no known vaccine or cure for COVID-19. No one is immune.

21. Common symptoms of COVID-19 include fever, cough, and shortness of breath. Other symptoms include congestion, sneezing, fatigue, or diarrhea. **(9)** Many individuals who become infected with COVID-19 may have mild or moderate symptoms; some may experience severe symptoms requiring intensive medical intervention. **(10)** However, even with hospitalization and intensive treatment, thousands of individuals have died as a result of this infection. Regardless of the type of severity of symptoms, all infected persons are contagious and can rapidly transmit the virus from person to person without proper public health interventions. The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects. **(11)**

22. People over the age of fifty-five face a greater chance of serious illness or death from COVID-19. In a February 29, 2020, WHO-China Joint Mission Report, the preliminary mortality rate analysis showed that individuals age 70-79 had an overall 8% mortality rate, individuals age 60-69 had a 3.6% mortality rate, and individuals age 50-59 had a 3.1% mortality rate. For individuals age 40-49 the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was as low as 0.2% **(12)**

23. People of any age who suffer from certain underlying medical conditions are also at an elevated risk, including people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immune compromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorder; and people who have had or are risk of stroke. **(13)** The WHO-China Joint Mission Report indicates that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer. **(14)**

24. For the vulnerable population, the symptoms of COVID-19, particularly shortness of breath, can be severe, and complications can manifest at an alarming pace. Most people in higher risk categories who develop serious illness will need advance support. This level of supportive care requires highly expensive and specialized equipment including ventilators that are in limit supply. **(15)**

25. Increasingly and in the UNITED STATES in particular, even some younger and healthier people who contracted COVID-19 may require hospitalization for supportive care including intravenous fluids and supplemental oxygen. Medical providers and medical

facilities are in peril of becoming completely overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 continues to spread. **(16)**

26. Even for those who survive COVID-19, recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys as well as to the organ systems such as the blood and the immune system. This damage is so extensive and severe that it may be enduring. Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed studies of some recovered patients in China and Hong Kong indicate a decline in lung function of 20% to 30% after recovery. **(17)**

27. The only way to prevent complications and the enormous risk to medically vulnerable people is to prevent them from becoming infected. Everyone is at risk of transmission of COVID-19. There is no available vaccine to protect against infection from COVID-19 and no medications approved to treat it. **(18)** The CDC and other public health agencies have universally prescribed social distancing—every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol based hand sanitizer, proper sneezing and cough etiquette, and frequent cleaning of all surfaces—as the only way to meaningfully mitigate the spread of this virus. **(19)**

28. The CDC has issued a guidance that gatherings of more than ten people must not occur. **(20)** People in congregate environments, which are places where live, eat, sleep in close proximity, face increased danger of contracting COVID-19, as already evidence by the rapid spread of the virus in cruise ships and nursing homes. The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown. **(21)**

29. On March 13, 2020 President TRUMP took the strictest measures to fight the virus spread, issuing a stay at home warning as well as shutting down most parts of the government. Starting on March 13, 2020 through at least April 7, 2020 which was then extended to April 30, 2020. President Trump warned that all non-essential businesses and operations to cease. As of now, people are allowed to leave their homes only for essential activities. Any gathering larger than ten is prohibited and people are recommended to stay at least six feet away from others. Restaurants, bars, schools, parks and libraries have all been shut down. In a statement to the public, Governor Pritzker explained he gave an "Executive ORDER for all of Illinois" of the such, and knew these actions are needed based on his conversations with "some of the best medical experts,

epidemiologist, mathematicians, and modelers" and all recommended to stay home order to avoid the loss of potentially tens of thousands of lives. **(22)**

30. The FBOP have taken certain protocol and actions to combat the virus. Each measure that IT TOOK, the more that the virus spread throughout THE PRISON. One example we can look at is Oakdale where union officials are taking court actions for the correctional staff. FIVE PRISONERS have died there from the virus, the most of any Federal prison. At least 25 inmates and 21 staff have tested positive including 7 prisoners who are on ventilators. Two FBOP employees are hospitalized, according to data from officials at the facility. The actual figure is almost certainly higher as there is very little testing being done.

31. Corrections officers and local officials report the persons of the FBOP are under siege by COVID-19. Union official have stated they are out of tests for their officers—so no inmates are getting testing, except in rare cases. Tents are being used in the recreation yard to house the sick. Health officials warned the cramped quarters and often unhygienic living conditions give the virus free run.

32. Mr. Melder refused comment, but his staff reported that within the Federal system of prisons their guards say the unique risk they face as a result of tight space, short staffing and strained health care system even before the virus hit, are now intensified by the lack of protective masks and other gear, faulty thermometers and insufficient cleaning supplies.

33. Bureau of Prisons, said it imposed "enhanced modified operations" at OAKDALE and other prisons like Greenville. However as long as the prison system is overloaded, and inmates cannot have a single cell, then never is a person able to minimize their exposure because the person might be medically vulnerable because his cellmate might not adhere to the same protection and bring the virus back to the cell. The prison population must be reduced to the point that there is no crowding and inmates are able to be housed separately. These prisoners, including the Plaintiffs were and could be sentenced to serve time, not sentenced to a death sentence; however all inmates are in a fight for their lives.

34. Nationwide eight Federal inmates have died from COVID-19 as of Sunday the 5th of April. Another 138 inmates and 59 FBOP employees have tested positive according to figures from FBOP.

35. FBOP have been criticized for weeks by staff for the slow response to the virus, FBOP said it has been implementing a plan to stem the spread in phases that have included suspending visits, limitative transfers of inmates between prisons and hold new prisoners 14 days in quarantine.

36. On April 1, 2020, the FBOP took rare steps of locking down every institution and only allowing inmates out of their cells for a limited amount of time. However, these inmates are still able to interact and are in groups of 20 when they are let out of their cells, at least at Greenville. They are able to pass the virus among one another, unless changes are made that is what will happen.

## II. Incarcerated People Are Particularly Vulnerable to Infection from COVID-19

37. None of the recommended measures for mitigating the spread of COVID-19 are available for persons confined in correctional facilities and for those who must interact with them. Correctional facilities are inherently congregate environments, where large groups of people live, eat and sleep in close contact with one another. It is impossible to achieve social distancing standards in settings. **(23)** Therefore infectious diseases, particularly airborne diseases, such as COVID-19, are more likely to spread rapidly between individuals in correctional facilities. **(24)**

38. The risk of contracting an infectious disease is also higher in correctional facilities because the facilities are not sanitary environments. People share toilets, sinks, showers, and often have limited access to soap, hand sanitizer, hot water and other necessary hygiene items. Surfaces are infrequently washed, if at all, and cleaning supplies are in short supply. **(25)** These needs are now multiplied and also compounded by the lack of personal protection equipment (PPE) such as masks and gloves for either staff or prisoners. This means there are more people who are susceptible to getting infected, all congregated together in a context in which fighting the spread of an infection is nearly impossible.

39. Given the history of epidemiologic outbreaks in correctional facilities, such as tuberculosis, influenza and MRSA hepatitis, it is expected that COVID-19 will also rapidly spread in prison, especially when prisoners are overcrowded and have two persons sharing the same toilets, sink and small cells and cannot distance themselves from infected residents and staff. **(26)**

40. The people who live in these environments (prisons)—environments that defy all current public safety standards are themselves at high rate of chronic health conditions, substance use, mental health issues, and aging and chronically ill populations who may be vulnerable to more severe illnesses and to death, after infection from COVID-19. **(27)** As Dr. Craig Haney, a correctional health expert, explains, prisoners are unusually vulnerable to stress related and communicable diseases. Formerly incarcerated prisoners suffer higher rates of certain kinds of psychiatric and medical problems. Incarceration leads to higher rates of morbidity (illness rate) and mortality (i.e. it lowers the age at which people die. **(28)**

41. Additionally, many correctional facilities lack an adequate medical core infrastructure to address the spread of infectious disease, like COVID-19, and treat high-risk people in custody. **(29)** Prison health units are not equipped with sufficient emergency medical equipment, such as oxygen tents, nasal cannula and oxygen face masks, to respond to an outbreak of patients with respiratory distress. For these reasons, among others, experts have warned that "Widespread community transmission of COVID-19 within a correctional institution is likely to result in a disproportionately high COVID-19 mortality rate." **(30)** Prisons and jails rely on outside community hospitals to provide more advanced and intensive medical care and during and epidemic this will not be possible as those outside facilities will likely be at or over capacity themselves. **(31)**

42. Prisons are not closed environments. By necessity, members of the free community, including correctional officers, social workers, attorneys, medical personnel and many others must enter and leave the prisons on a daily basis. Staff arrives and leaves each facility three times a day in large numbers, and there is little to no ability to adequately screen staff for new symptomatic infection. When the COVID-19 virus occurs and spreads within a prison, all persons, staff and prisoners alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they come in contact in their own homes and neighborhoods. **(32)**

43. At the Governor of Illinois's March 29, 2020, daily briefing on the coronavirus situation, Illinois Department of Public Health (IDPH) Director Dr. Ngozi Ezike acknowledged the present danger that when the infection enters prisons, the congregate nature of these facilities, with staff coming and going from the community each day in large numbers, it will "increase the rate of infection and its fast spread through these facilities." **(33)**

44. On March 30, 2020, following the death of a COVID-19 patient at Stateville Correctional Institution, (we will use this example as the FBOP is delaying release of information about Oakdale and other institutions), Dr. Ezike again acknowledged the heightened risk posed by correctional settings and the inability to conform them to public health standards:

> "Congregate settings such as Stateville, and any other correctional centers, pose unique challenges in stopping the spread of disease and protecting the health of individuals who live and work there. Those who are incarcerated obviously live and work and eat and sleep and recreate all within the same environment, heightening the potential for COVID-19 to spread really quickly once its introduced,"

The options for isolation of COVID-19 cases are limited in this focused setting and it becomes very difficult depending on the size of the facility and the population that's already in the facility. Ideally, all cases should be isolated individually and close contact should be quarantined individually. I know our partners at the Department of Corrections

are working innovatively to try and create the best situation for these facilities but some facilities and correctional centers do not have enough individual cells, so we are considering isolating multiple laboratory confined COVID-19 cases together as a group, or quarantine close contact of a particular case together as a group. **(34)**

45. The devastating impact that a COVID-19 outbreak in FBOP will and is having on surrounding communities is already a reality. Let's look again at Stateville Correctional Center announced its first confirmed case on Wednesday, March 25, 2020, and by Monday evening, March 30, 2020, St. Joseph Hospital in Joliet was "overwhelmed" by inmates suffering from the effects of coronavirus and staff were "maxed out." **(35)** The hospital director, Dr. John Walsh, said "This is a disaster because what I fear now is that without some reduction, the number of cases coming in from Stateville will become excessive. We currently have nine inmates on ventilators, critically ill. There were four inmates in the emergency a couple of hours ago, and I believe the volume of patients there is huge. In addition, something has to be done now. You will have a huge epidemic, remembering that 20% of the people who contract the virus are probably going to end up in the hospital and a number of them are going die. This could end with up to 100 inmates dying if this is out of control, and they are not isolated well at this point." **(36)** St. Joseph Hospital is now caring for 17 prisoners from Stateville, 9 of who are in the intensive care unit on ventilators. Other communities throughout Illinois are similarly situated just as prisons of FBOP, many with far fewer intensive care beds available to provide care when an outbreak occurs. To prevent the crisis now occurring at Oakdale from repeating and worsening across the state, effective mitigation measures must be taken now.

### III. Reducing the Prison Population Is the Only Meaningful Means to Prevent the Harm Caused by COVID-19 in Prisons and Their Surrounding Communities.

46. Because the public health and safety measures cannot be fully achieved in correctional facilities, other steps MUST be taken to save lives and protect the spread of the infection from these communities. Proactive risk mitigation, including eliminating close contact in congregate environments, like single cells, is the only effective way to prevent the spread of COVID-19 infection. In fact, a study published in the Journal of Travel Medicine found that the number of COVID-19 cases on the Diamond Princess Cruise ship would have been more than eight times lower if the ship had been evacuated in a timely manner, rather than requiring the passengers to quarantine within the close confines of the ship. **(37)**

47. Public health experts with experience in correctional settings have similarly recommended the release from custody of people most vulnerable to COVID-19 to

10

protect the communities inside and outside the prisons, and to slow the spread of COVID-19 infection. Population reduction protects the people with the greatest vulnerability of COVID-19 from transmission of the virus, and also allows for greater risk mitigation for all people held or working in a correctional facility. Prisons are often located in small rural communities, removing the most vulnerable people from custody, will also reduce the burden on those regions' limited health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time and require hospitalization in these small communities.

48. Dr. Robert Greifinger, a correctional health expert, has concluded that "[R]isk mitigation is the only viable public health strategy available to limit transmission of infection, morbidity and mortality in prisons, and to decrease the likely public health impact outside of the prison. Even with the best-laid plans to address the spread of COVID-19 in prisons, the release of individuals, prioritizing the most medically vulnerable individuals, is a key part of a risk mitigation strategy...additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility."

49. Dr. Greifinger explains that reducing the prison population "has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced: it allows easier provision of preventive measure such as soap for handwashing, disinfecting supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff, which will likely be reduced by illness, such that they can continue to ensure the safety of detainee's."

50. Similarly, Dr. Craig W. Haney, a distinguished Professor of Psychology and Presidential Chair at the University of California, Santa Cruz, recommends that "adult prisons must reduce their populations urgently in order to allow the necessary social distancing in response to the COVID-19 pandemic." **(38)**

51. Professor Chris Broyer, Professor of Epidemiology at John Hopkins Bloomberg School of Public Health, has concluded: "While ever effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain. It is therefore an urgent priority in this time of National Public Health Emergency to reduce the number of persons in detention as quickly as possible." **(39)**

52. Dr. Jaime Meyer, Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing, has concluded that "[R]educing the size of the population in jail and prisons can be critically important to reducing the level of risk both for those within those facilities and for the community at

11

large." (40)  She explains that "[H]ealth in jail and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities, is vital to protecting the health of the wider community." **(41)**

53. Dan Pacholke, a correctional expert with more than 37 years of experience, has specific recommendations for steps IDOC and FBOP can take to proactively respond to COVID-19 to protect the health and safety of people in prison and their staff. **(42)**  Mr. Pacholke explains "among those steps is considering how (government) can exercise its authority and discretion...to reduce the prison population.  This includes awarding good time credits, transferring people to home detention, and authorizing compassionate release." Mr. Pacholke further explains that "[A]ll of these and any other options should be fully utilized to allow individuals to maintain social distancing and have better access testing and treatment.  This will also help mitigate the impact of staff shortage and lessen the burden on prison medical services." **(43)**  Internationally, governments have recognized the threat posed by COVID-19 in correctional facilities and have released detainees. Even Iran, for example, about 70,000 people was released from jails to curb the spread of COVID-19. **(44)**

54. In the United States, the need to address the COVID-19 problem in prisons has been recognized.  The COVID-19 stimulus package passed by Congress specifically includes funding for Federal prisons to purchase personal protective gear and test kits for COVID-19 because of the "density of inmate population, the high traffic, the high volume of inmates [and] the high rate of turnover of inmate and personnel." (45)  This bill only allows the Attorney General to lengthen the maximum of time that a Federal prisoner can be placed in home confinement during the pandemic.  These Defendants have within their power to allow wardens to issue GOODTIME CREDIT, GRANT clemency to all viable applications waiting which is more than 3,000 and so much more without even going to Congress for a new bill.

55. On March 30, 2020, the UNITED STATES HOUSE OF REPRESENTATIVES committee on the Judiciary RECOMMEND a similar plan of action calling on the FBOP to drastically increase its population reduction efforts, including through release where viable and increased use of home detention, which the FBOP failed to act urgently with the actions needed. **(46)**

56. Echoing the calls of advocates and medical professionals, a group of 35 elected prosecutors have called on leaders within the criminal legal system to drastically reduce the number of incarcerated individuals and the threat of disastrous outbreaks. **(47)**

57. Many states have begun to take steps to protect people in prison from the impending spread of COVID-19 by releasing people in an effort to reduce their prison population.

This includes but not limited to California, Iowa, New York, Colorado and Vermont which only had a prison population of 1,600 inmates and released 300 of them in the month of March. **(48)**  Alameda County in Northern California, more than 300 individuals has been released from jail in the span of two weeks, amounting to 11% of the jail population. **(49)**  Cleveland Ohio drastically reduced the Cuyahoga County jail population by releasing over 700 people from detention, a 35% reduction in population. **(50)**

58. Supreme Courts in several states have collaborated in or led the efforts to reduce jail population by issuing orders, demonstrating a growing consensus on the huge impact that the virus has within detention from New Jersey jail, which is nine percent of the population. **(51)**  South Carolina Chief Justice ordered the release of all individuals charged with a non-capital offense on their own recognizance, unless the individual presents an unreasonable danger to the community or is an extreme flight risk. **(52)**  In Montana, the Chief Justice instructed his state judges to "review your jail rosters and release, without bond, as many prisoners as you are able to, especially those who are being held for non-violent offenses."

## IV.  FBOP DIRECTOR, M.D. CARVAJAL, UNITED STATES ATTORNEY, WILLIAM BARR, PRESIDENT OF THE UNITED STATES, DONALD J. TRUMP, DOJ DIRECTOR, ADAM COHAN and WARDEN TOM WERLICH are Failing to take Necessary Precautions to Reduce the Spread of COVID-19 within Prison and Their Surrounding Communities, Placing People at an Increased Risk.

59. The FBOP operates 4,991 adult correctional facilities (state, Federal and local, not counting juvenile) throughout the United States and houses 2.3 million individuals. There are more than 400,000 employed by the FBOP.

60. The FBOP are on the cusp of an outbreak, but there is still time for urgent and decisive action that can prevent harm.  First confirmed case of COVID-19 in the FBOP on March 20, 2020.  As of today, April 14, 2020, 416 Federal prisoners and 248 staff have tested positive for COVID-19.  The FBOP is failing for testing the general population on a broad scale, which needs to be done.  Without testing we do not know how high that number really is.

61. None of the Defendants acted with the urgency or decisiveness that is required to quell the oncoming crisis.  No real steps have been taken to reduce the population or expand the FBOP ability to discharge, compassionately release or transfer to home detention or grant clemency to those that are viable.  FBOP has taken only limited steps to this end, releasing far fewer than it can even in cases of those who are medically vulnerable and have a pathway home.

62. The "Cares Act" passed by Congress on March 27, 2020 was a step in the direction needed but fell short on what needs to be done. These Defendants have the power to act to prevent loss of life and to protect the communities, the staff and prisoners by reducing the population of these prisons nationwide.

63. These Defendants have to take action to protect the prisoner population that cannot protect itself, by allowing inmates to have the social distancing that is needed, and that means reducing the prison population with...

    1) Awarding good time allotments of 5 years to all prisoners within 15 years of release.
    2) Releasing all inmates who are non-violent offenders.
    3) Grant all clemency applications that are viable, meaning non-violent offenders, not excluding any inmate as long as there was no violence committed in their crime.

64. These Defendants possess the authority to make decisions that would combat the virus in a way that would certainly save lives and protect those that work for them, and the prisoners that are dependent on them but as well as the community where the prisoners are located.

65. Despite the pressure from medical professionals, and from advocates, and despite the admissions of their own administration that people in the FBOP custody are especially vulnerable to contracting and spreading COVID-19, the FBOP is not utilizing its authority with any degree or urgency to identify and release medically vulnerable prisoners or prisoners who have a pathway home.

66. If FBOP does not act immediately to reduce its prison population dramatically, COVID-19 is likely going to spread rapidly throughout FBOP, overburdening FBOP medical care programs and likely resulting in death. (53)

## V.    Plaintiffs are Particularly Vulnerable

67. Plaintiffs in this case are individuals who are currently housed in Federal prison/detention centers and who are particularly vulnerable to serious illness or death if infected by COVID-19.

68. Jason Parmeley, a Federal institution prisoner currently located at Greenville, an FCI in Illinois, Mr. Parmeley was diagnosed with hypertension and neurological complications as well as epilepsy. He shares a 12 foot by 15 foot cell with another inmate, which he

shares a toilet, sink and chuckhole through which they receive their meals. Social distancing is impossible even if he is very careful to limit his exposure to others, he cannot control what his cellmate does and once they are locked back in their cell after recreation, it is easy for Mr. Parmeley to be exposed to everyone and everything his cellmate was exposed to while he was socializing for recreations. Mr. Parmeley is serving a sentence for a non-violent crime and has eight years until his release. He has served 39% of his sentence.

69. Marco Guirlando, a Federal pre-trial detainee currently located at Union County, a local jail in El Dorado, Arkansas, Mr. Guirlando was diagnosed with asthma as a child and had surgery, approximately, in January 2019 to remove a pre-cancerous benign tumor, (spindle cell lipoma) from his upper back and has not had his bi-annual or annual scan to follow up on the tumors status. In addition, Mr. Guirlando has suffered from numerous facial fractures of both his nose and orbital sockets which has resulted in more than five surgeries to repair. Mr. Guirlando cannot sustain any impact or trauma to his face. He shares an approximate 12 foot by 10 foot cell with as many as seven other cellmates, which he shares a toilet and sink. Social distancing is impossible even if he is very careful to limit his exposure to others, he cannot control what his cellmates do and once they are locked back in their cell after "pod time", it is easy for Mr. Guirlando to be exposed to everyone and everything his other cellmates were exposed to while he was in the 30 man pod, which houses the showers, chow tables and phone. Mr. Guirlando has been **awaiting sentencing** for 15 months for a non-violent soft crime. The maximum time set forth by the prosecutor is ten years.

## CLASS ACTION ALLEGATIONS

Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the individual named Plaintiffs brings this action on behalf of themselves and a class consisting of all people who are currently or will in the future be housed in the FBOP during the duration of the COVID-19 pandemic. Plaintiffs request for release from physical custody is limited to the following four subclasses:

Subclass 1:

a) People in custody who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition or related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorder (including sickle cell disease), inherited

15

metabolic disorder, people who have had or at risk of stroke, and people with any other condition specifically identified by the CDC either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for compassionate release or discharge.

Subclass 2:

People in custody who are medically vulnerable to COVID-19 because they are 55 years of age or older, who are eligible for compassionate release or discharge.

Subclass 3:

People in custody who are within 15 years of their release date who are non-violent offenders that pose no threat to the public.

Subclass 4:

People in custody who have a clemency application pending before President Trump.

70. A class action is the only practical means by which the individual named Plaintiffs and the class members can challenge the Defendant's unconstitutional actions. Many members of the class are without means to retain an attorney to represent them in a civil rights lawsuit.

71. The class and subclass are so numerous that a joiner of all members is impractical. The number of people in custody exceeds 2.3 million on any given day, and each subclass contains thousands of people. There are 5,000 plus inmates who are older than 55 years of age.

72. There are questions of law and facts common to all class members and the subclass, including: *(1)* does COVID-19 present a substantial risk of harm to people in the custody of FBOP *(2)* do the Defendants have available to them measures that could reduce the number of prisoners in the FBOP including those who are especially vulnerable to COVID-19; and *(3)* have the Defendants failed to act reasonably to mitigate the spread of COVID-19 and pre-test those in custody who are vulnerable by not fully utilizing every means available to them, and other mechanisms to reduce the prison population?

73. The claim of the named Plaintiffs is typical of those of the class as a "who" in some aspects. That typically stems from their claim that Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of COVID-19 if the FBOP fails to take meaningful action to reduce the in-custody population. While members of subclass 1-2 have an increased risk of death as a result of the threat of COVID-19 and subclass 3-4 suffers due process violations, the overarching nature of the

16

threat of COVID-19 to every person confined in FBOP custody is sufficient to satisfy typically.

74. The individual named Plaintiffs will fairly and adequately represent the interest of the class and subclasses. The named Plaintiffs have no conflict with the unnamed members of the proposed class. In addition, the named Plaintiffs expect Court to appoint counsel in the suit who is a fully experienced civil rights lawyer. Defendants refused to act in a manner that applies generally to the class as a whole, rendering class-wide injunctive and declaratory relief appropriate.

## COUNT I

42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19 (Alleged by all Plaintiffs on Behalf of Themselves and the Class Against All Defendants)

75. Plaintiffs and the classes they represent have been deprived and continue to be deprived by the Defendants of their rights under the Eighth Amendment to reasonably safe living conditions. Specifically, Defendants are aware of the substantial risk of harm that COVID-19 poses to all individuals, and are further aware of the particular risk of severe illness and possible death that Plaintiffs face as a result of the inherently congregate settings in Defendants correctional facilities. Despite this knowledge Defendants have failed to take reasonable measures to transfer eligible people in FBOP physical custody to compassionate release or home detention, and/or release them from FBOP custody.

76. As a result of the Defendant's actions and inactions, class members face a serious illness that could lead to death. This harm manifests in two ways: *(1)* members of the subclasses who are eligible for release are unnecessarily exposed to an exponentially increased risk of contracting COVID-19 and suffering a serious illness that could lead to death for so long as they remain in FBOP physical custody: and *(2)* class members who are exposed to the virus because they are not able to social distance due to overcrowding.

77. The Defendant's failure to take appropriate steps to curb the substantial threat posed by COVID-19 to each person in FBOP custody, as described more fully above, constitutes deliberate indifference to Plaintiffs rights to be free from cruel and unusual punishment. Defendants know of and are disregarding a substantial risk of serious illness and/or death people face as a result of the pandemic.

78. Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## COUNT II
### 42 U.S.C. §1983 Right to Due Process Under the Fourteenth Amendment

79. Plaintiffs represent, and re-allege the proceeding paragraphs as if fully set forth in this count.

80. Plaintiffs and the subclass they represent are eligible for transfer from FBOP custody.  In the midst of this Global Pandemic, the Defendants have failed to establish a system wide efficient process that would, with all deliberate speed, evaluate every individual who is eligible for transfer from FBOP physical custody to determine if that person can be transferred to release without compromising public safety.  As a result of the Defendant's failures to establish such a process, members of these subclasses are prohibited from seeking their transfer and as a result they are forced to be exposed to the threat of serious illness or death posed by COVID-19 in FBOP prisons, in violation of their procedural and substantive due process rights.

81. Consequently, the Defendants are in continuous violation of these Plaintiffs rights and the rights of the members of the subclasses under the Fourteenth Amendment to the United States Constitution.

82. Plaintiffs seek injunction and declaratory relief against all Defendants to prevent the continued violation of the Plaintiffs and the class they represent.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs on behalf of themselves and the putative class they seek to represent, request that this Court enter judgement in their favor and against Defendants Donald J. Trump, William Barr, M.D. Carvajal and Adam Cohen order the following relief:

A. Immediate compassionate release for members of subclass 1:  people in custody who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions including chronic lung disease or moderate to severe asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or any other condition related to treatment for a medical condition; people with chronic liver or kidney disease or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), inherited metabolic disorders; people who have had or are at risk of stroke; and people with any other condition specifically identified by CDC

18

either now or in the future as being a particular risk for severe illness and/or death caused by COVID-19, and who are eligible for compassionate release or discharge.

B. Immediate compassionate release to members of subclass 2:  People in custody who are medically vulnerable to COVID-19 because they are 55 years of age and older who are eligible for compassionate release or discharge.

C. Immediate transfer to home detention or halfway house for members of class 3.

D. Immediate ORDER DEFENDANT DONALD J. TRUMP to GRANT clemency to all viable applications.

E. Issue and order and judgement an immediate reduction of prisoner to the point of inmate housing in single man cells in all Federal prisons.

F. Grant such order relief as this Court deems just and proper.

83. Pursuant to 28 U.S.C §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day of 14th of April 2020

/s/ _Jason Parmeley_

Jason Parmeley 13231-045
FCI Greenville
PO Box 5000
Greenville, IL  62246

/s/ _Marco Guirlando_

Marco Guirlando 143209
Union County Jail
250 American Road
El Dorado, AR  71730



U.S. POSTAGE PAID
FCM LG ENV
COTTLEVILLE, MO
63338
APR 17, 20
AMOUNT

$1.80

R2304E105675-22

1099          62201

UNITED STATES
POSTAL SERVICE

Jason Parmeley  13231-045
FCI Greenville
Po Box 5000
Greenville, IL 62246

Ob Clerk United States District Court
Southern District of Illinois
750 Missouri Avenue
East St. Louis, IL 62201



RECEIVED

APR 2 3 :::3

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

